**FORD MOTOR COMPANY, Appellant,**

v.

**Robert BENSON, as next friend
of Brooklie Dawn Benson,
A minor, Appellee.**

**No. C14–92–00369–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 7, 1993.

Rehearing Denied Feb. 4, 1993.

Mark T. Beaman, Craig A. Morgan, Austin, for appellant.

Russell L. Cook, Jr., Frank M. Bean, Houston, for appellee.

Before JUNELL, ROBERTSON and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

· Ford Motor Company appeals the trial court's order of March 15, 1992 entered pursuant to Tex.R.Civ.P. 76a. Appellant raises six points of error challenging the trial court's interpretation of Rule 76a, the sufficiency of the evidence supporting the order, and the constitutionality of the rule. We reverse.

Appellee brought suit against appellant alleging defective design of the Bronco II. Appellee filed a request for production seeking a variety of documents and materials. · Appellant refused to produce any documents until a protective order was entered that limited disclosure and dissemination of documents containing confidential information. The trial judge ruled, however, that compliance with Rule 76a was necessary before determining whether a protective order was appropriate. Thereafter, appellee filed a motion to compel appellant to produce the documents or to file a motion in compliance with Rule 76a. Appellant then filed its Motion for Protective Order and in the Alternative Motion for Temporary Relief under Rule 76a.

The court held a two-day hearing. Appellant put on testimony tending to show that certain documents contained trade secrets. Appellant first offered testimony by Alfred Darold, a design analysis engineer in truck operations at Ford. Darold testified that he had reviewed almost all of the documents collected for production. Based on this review, Darold testified that the following types of documents contained trade secrets: (1) engineering documents; (2) marketing documents; (3) board of directors and subcommittee meeting minutes; (4) documents produced to NHTSA that remained confidential; and (5) the program description book. Darold explained that the engineering documents contain analyses, plans for tests, data generated from tests or ·computer analyses, and notes and thoughts exchanged by engineers. Because these documents reflect the design and development process and discuss Ford's computer simulation process, Darold maintained that these documents are considered by Ford to be proprietary. The marketing documents help Ford determine customers' thoughts about Ford products and about Ford's competitors' products. Darold added that the meeting minutes dis-

cuss company strategies regarding evolving product plans and technology and give insight into high-level decision-making. Finally, Darold testified that the program description book contains documents compiled by Ford regarding their strategy in meeting objectives for development of a vehicle. Darold had read part of the depositions of Fred Parrill and Bickerstaff and asserted that these included discussions regarding confidential engineering processes and judgments. Darold had not read the depositions of other Ford employees.

Appellant also presented the testimony of Jeffrey Miller, who worked for the National Highway Traffic Safety Administration (NHTSA) from 1985–91. Miller testified that NHTSA's mission is to reduce traffic accidents, deaths and injuries. This agency promotes driver safety, investigates alleged defects in vehicles, and if a defect is found, can order a recall. NHTSA began investigating the Bronco II in 1989. Thousands of documents were produced to NHTSA. Ford requested confidential treatment of certain documents, but NHTSA did not grant all of Ford's requests. Miller noted that NHTSA did find substantial competitive harm would result if it did not treat as confidential Ford's engineering information, product testing information, and its marketing data. NHTSA did not seek preproduction or prototype information because it considered these documents irrelevant. NHTSA only sought information about vehicles actually being used by consumers.

Miller's testimony regarding NHTSA's conclusion about the Bronco II also related to the issue whether any of the documents concerned matters having a probable adverse effect on public health or safety. Miller stated that, after two years of investigation, NHTSA concluded there was no evidence to suggest the Bronco II contained a safety-related defect.

Following the testimony of these two witnesses, several persons made unsworn statements. Theses parties were: Mr. Edward Seniguar, whose son had been injured when his Bronco II was involved in an accident; Benjamin Kelly, appearing for the Institute for Injury Reduction, a non-profit organization founded by plaintiffs' attorneys; and Buddy Payne, a Florida attorney who represents three persons involved in Bronco roll-over accidents. These persons made general statements about the danger to the public and the need to avoid giving Ford a blanket protective order.

One of the intervenors then called Frank Vaden, an attorney specializing in intellectual property law, who testified that there should be no trade secret protection for technology that causes a light truck to roll over because of the overriding public policy of public safety. Following this witness was another intervenor, Tod Kastetter, who made an unsworn statement. Kastetter, an attorney from Colorado, represents a person injured in a roll-over accident in a Bronco II.

The final witness was Leon Robertson, who has performed research for the last 21 years on motor vehicle related injuries. Robertson testified that he has done two studies on rollover in utility vehicles. The second study included the Bronco II. Robertson's testimony concerned statistics showing the roll-over rate in the Bronco II as opposed to other vehicles.

In closing argument, appellee claimed that certain general categories of documents had a probable adverse effect on public safety and thus, were court records. These categories of documents included: (1) depositions of certain Ford employees regarding discussions before the vehicle was manufactured about fatalities and likely fatalities, including all statistical information regarding roll-overs of any type; (2) documents concerning design decisions for Ford's office of general counsel; (3) documents containing the results of Ford's testing of the Bronco II; (3) documents concerning the jacking phenomenon of the twin I-beam suspension; (4) documents showing how Ford prepared its response to NHTSA, what was and was not produced to NHTSA; (5) documents regarding Consumer Union; (6) Ford's public relations campaign regarding Bronco II rollovers; (7) documents concerning alteration of material evidence in this case and in evidence

presented to NHTSA; (8) documents regarding the committee testimony of Mr. Darold in which no notes were to be taken; (9) marketing data indicating that Ford targeted young inexperienced drivers in marketing the Bronco II; (10) all *in camera* exhibits to plaintiff's response to Ford's motion for protective order.

The court then made an *in camera* inspection of thousands of documents. Following an extensive review, the trial court entered an order finding the following material to constitute court records: (1) the depositions of Ford employees Bickerstaff, Drotar, Versace, Hackert, Parrill, Antoun, Avouris, Grush, and Leinonen, and all documents referenced in those depositions; (2) videotape # 12535; (3) all worksheets, statistical information, graphs, FARS analyses, data, and memos relating to the rollover incident rate and/or rollover fatality rate of the Bronco II, including comparative data for other vehicles; (4) all documents reflecting or relating to any Bronco II design decisions made by Ford's Office of General Counsel; (5) all documents reflecting or relating to the results of Ford's testing of the Bronco II for rollover, handling, and stability; (6) all documents relating to the alleged "jacking" of the twin I-beam suspension; (7) all documents reflecting or relating to Ford's response to the NHTSA document request; (8) all documents relating to Ford's dealings with Consumers Union; and (9) all documents relating to public relations efforts dealing with Bronco II rollovers.

The trial court also found all of the documents held confidential by NHTSA to be public records except the demographic and registration data concerning vehicle ownership, general descriptions of engineering test procedures, reports from Carron & Co., and program sign-off and development evaluation sheets and trip reports (except those revealing rollover or wheel lift during evaluation drives of the Bronco II). For those NHTSA documents the trial court did not find to be public records, the court ruled that these could be protected by a protective order under Rule 166b. The trial court also found the following categories of documents not to include pub-

lic records and found that these could be protected under Rule 166b: (1) Bronco II Program Description Book; (2) market surveys and other market research data; (3) minutes of meetings of the board of directors and other committees except those dealing specifically with rollover or stability issues; and (5) materials specification documents. Because the trial court found many of the engineering and computer analysis documents submitted *in camera* to resemble closely the documents in the NHTSA public file, the trial court ruled that these were also public records. Two weeks later, the trial court entered a protective order regarding those documents not covered by the Rule 76a order.

In point of error one, appellant contends the trial court erred in concluding that Rule 76a precluded entry of an interim protective order pursuant to Rule 166b.5(c). In point of error two, appellant challenges the sufficiency of the evidence supporting the trial court's finding that the unidentified documents within the broad categories described in the order were court records under Rule 76a. Alternatively, appellant claims the trial judge abused her discretion in entering an order that was overbroad and encompassed routine discovery matters.

Rule 166b.5 authorizes the trial court to enter a protective order. TEX.R.CIV.P. 166b.5. The court's authority under this rule extends to "ordering that for good cause shown results of discovery be sealed or otherwise adquately protected, that its distribution be limited, or that its disclosure be restricted." TEX.R.CIV.P. 166b.5(c). Any order under this subsection that involves "court records" must comply with Rule 76a. TEX.R.CIV.P. 166b.5(c). Rule 76a applies only to "court records." Thus, any court action under Rule 166b.5(c) need not also comply with Rule 76a unless court records are involved.

Rule 76a provides a definition of those documents constituting "court records," which includes the following type of documents:

(c) discovery, not filed of record, concerning matters that have a probable adverse effect upon the general public health or safety, or the administration of public office, or the operation of government, except discovery in cases originally initiated to preserve bona fide trade secrets or other intangible property rights.

TEX.R.CIV.P. 76a(2)(c). Because appellant did not request a sealing order under Rule 76a, appellant claims the trial court should have proceeded with the determination whether to enter a Rule 166b.5 protective order with no regard for Rule 76a until appellee alleged and established that documents sought to be protected were "court records." Thus, appellant argues that the non-movant in a Rule 166b.5 proceeding has the burden of showing the court that there must first be compliance with Rule 76a by establishing that some or all of the documents are "court records". We agree.

When a trial court receives a motion for protective order under Rule 166b.5, the rule clearly provides that Rule 76a is not implicated unless documents sought to be protected include "court records" as defined in Rule 76a. TEX.R.CIV.P. 166b.5(c). When the trial court in this case determined that there had to be compliance with Rule 76a first, there had been no allegation or proof that any of the documents were "court records." Thus, there was no basis for the trial court to determine that Rule 76a applied. We believe that, when a party moves for a protective order under Rule 166b.5(c), the trial court should first determine whether there is good cause for protecting the documents from distribution or disclosure as the rule authorizes. TEX. R.CIV.P. 166b.5(c).

In the instant case, both parties submitted proposed protective orders. At the hearing on the Rule 166b.5 motion, the trial court did not determine whether there was good cause for entering an order under Rule 166b.5. Rather, the trial court revealed her *sua sponte* decision that there had to be compliance with Rule 76a before a protective order could issue. Had the court heard testimony at that hearing on appellant's alleged good cause and issued a protective order regarding those documents found to contain confidential trade secret or commercial information, the number of documents protected from disclosure would have been narrowed. Furthermore, the documents would have been produced to appellee.

Appellant was not required to move for an order sealing these documents when it only desired an interim protective order. If, however, appellee believed after reviewing the produced documents, that some of those documents temporarily protected from disclosure were "court records" under Rule 76a and should be available to the public, it would then be appellee's burden to allege and establish that specific documents "have a probable adverse effect upon the general public health or safety...." TEX.R.CIV.P. 76a(2)(c).

Since appellant had the burden under Rule 166b.5 to show that certain documents contained trade secrets, appellant presented the testimony of two witnesses regarding the confidential or proprietary nature of certain documents. Because the documents had not been produced, appellee was unable to assert that specific documents contained information reflecting a probable adverse effect on public health or safety. The only witness that had reviewed any of the documents was appellant's expert on trade secrets. Little of the rest the testimony at the hearing concerned documents. Instead, much of the remaining testimony and unsworn statements addressed the tendency of the Bronco II to roll over and other suits involving Bronco II roll-over accidents.

The procedure used by the trial court precluded appellee from receiving the documents, reviewing them, and therefore having the ability to present argument and evidence regarding why specific documents should be classified as public records under Rule 76a. Likewise, the court's procedure denied appellant a meaningful opportunity to be heard on any specific documents. Appellant was unable to offer proof why particular documents had no probable adverse effect on public health or safety or why specific documents contained trade se-

crets or confidential commercial information for which disclosure could cause competitive harm.

Accordingly, we find the trial court erred in concluding, absent a motion to seal court records, that there had to be compliance with Rule 76a before the court could consider and rule on a motion for protective order under Rule 166b. We sustain point of error one. Because we have found reversible error in the trial court's application of Rule 76a, we need not address appellant's other points of error.

We reverse the trial court's order and remand this cause for further proceedings in accordance with this court's opinion.